DIVISION OF FAMILY SERVICES,
(DFS) Petitioner,

v.

L.X. and C.X., Respondents.

In the Interest of: K.X.X.,
(d.o.b. 4/17/00).

No. 01–03–05TN.

Family Court of Delaware,
New Castle County.

Submitted: Feb. 12, 2002.
Decided: May 10, 2002.

Stephanie Tarabicos, Esq., Department of Justice, Wilmington, for Petitioner.

Mark Sisk, Esq., Hughes, Sisk & Glancy, P.A., Wilmington, for Respondent, Mother.

Kelly Sasso, Esq., Valocchi & Sasso, P.A., Wilmington, for CASA.

C.X., pro se.

## DECISION REGARDING PETITION TO TERMINATE PARENTAL RIGHTS

COONIN, J.

This matter is before the Court on the Petition of the Department of Services for

Children, Youth and Their Families, Division of Family Services (hereinafter "DFS") against L.X. (hereinafter "Mother") and C.X. (hereinafter "Father") seeking to terminate parental rights in their daughter, K.X.X. (d.o.b. 4/17/00) (hereinafter "K.") for the purpose of freeing K. for adoption. The Petition seeks termination of parental rights of both parents on the ground of failure to plan in accordance with 13 *Del.C.* § 1103(a)(5) and against Father on the additional ground of abandonment in accordance with 13 *Del.C.* § 1103(a)(2).

The Petition was filed on March 13, 2001. Although originally scheduled for trial on April 27, 2001, trial was continued when both Mother and Father appearing *pro se* requested that legal counsel be appointed to represent them. This case was reassigned to this Judge in July of 2001 and trial was rescheduled to November 28, 2001. By Order dated October 1, 2001, Father's court appointed counsel was granted leave to withdraw his appearance because of lack of cooperation. On November 28, 2001, the new date set for trial, Father failed to appear and Judgment by default was entered against Father contingent upon the Court, terminating the parental rights of Mother after trial on the merits. Trial against Mother was rescheduled.

Trial began on Wednesday, January 9, 2002, with Father, against whom judgment by default had previously been entered, in attendance. On the second day of trial, January 10th, Mother, who had been hospitalized the week before experienced a relapse of symptoms and required immediate care. As a result of this medical emergency, resumption of the trial that day was postponed until Tuesday, February 12, 2002, at which time the trial was completed.

This is the Court's Decision on the Petition for Termination and Transfer of Parental Rights.

## FINDINGS OF FACT

This case revolves around K.X.X., born April 17, 2000. DFS received emergency custody of K. when she was just four weeks old, when an Ex Parte Order of Custody was entered on May 18, 2000. An Order continuing custody in DFS was entered at the Probable Cause Hearing of May 25, 2000. On June 14, 2000, an Adjudicatory Hearing was held in which Father, who had appeared at the Probable Cause Hearing was now absent. Mother agreed to a Consent Order at that time finding that K. was a dependent child as defined by 10 *Del.C.* § 901(8) that it was in K.'s best interest to be in the care and legal custody of DFS and that the State was, at that time, making reasonable efforts towards reunification. On July 10, 2000, a hearing was held on the Dependency/Neglect Petition for Custody filed by J.X., maternal Grandmother, seeking custody of K. back from DFS. At the conclusion of that hearing, Commissioner Stewart found that it was not in K.'s best interest to be placed in the home of maternal Grandmother due to conflicts between Mother and maternal Grandmother and entered an Order continuing custody of K. with DFS.

DFS's first involvement with this family came on May 16, 2000, when a hotline report regarding K. was received advising that K. had been abandoned by Mother who left her with an 18 year old, non-relative friend. Father was then, and continues to take no part of the child's life. The friend of Mother with whom the child had been left, B.X., advised DFS that Mother had informed her that she felt overwhelmed with K. and did not wish to care for her anymore. Kristin Dunn, of

DFS, interviewed Mother following the Probable Cause Hearing on May 25, 2000. Mother advised Ms. Dunn that she had had a history of depression and attempted suicide which had previously required hospitalization.

Mother dropped out of school in the ninth grade and had not since held any stable employment. Until shortly before her abandonment of K., Mother had been living with maternal Grandmother, but due to a long history of conflicts in the relationship, Mother decided to move in with one A. and X.Y. Although Mother had only recently met the Y.s, she expressed the opinion that Mrs. Y. could assist her in raising K. Mother explained that she had abandoned K. because she "needed a break".

DFS explored the possibility of placing K. with maternal Grandmother but ruled this out due to Grandmother's demanding work schedule in which she was then maintaining 2 jobs. Maternal Grandmother felt Mother was unable to parent her child expressing concerns with regard to Mother's expectations of parenting K., noting that Mother appeared overwhelmed and disinterested in the child.

DFS, as soon as it had custody, established a visitation schedule which Mother cancelled. DFS rescheduled visitation for May 26, 2000, at 10:00 a.m., at which time Mother showed up 20 minutes late. Although Mother asked questions about K.'s formula and travel vouchers, she paid little attention to the infant herself. When mother held K., she did not talk or look directly at the child, appearing uncomfortable and indifferent toward the child. Mother periodically would laugh at K.'s "grunts" as she called them, but the majority of the time, Mother merely sat quietly holding the child, according to the case worker.

As part of its internal procedures, in May of 2000 DFS conducted an Investigation Risk Assessment, a protocol in which an analysis of various factors is performed in order to determine the extent to which placement of the child with an individual potential poses risk to the child. Mother scored 2.11 on the risk assessment scale, indicating according to DFS, that Mother posed a "significant risk" to K.'s well-being. Considerations highlighted in the DFS report included Mother's placing K., then less than a month old with a non-relative caregiver on two separate occasions, and taking the child out of maternal Grandmother's home with neither any specific or appropriate plans for care for the infant. Other factors considered were Mother's long standing history with DFS dating back to her own childhood, a history significant for conflicts with her own mother as well as Mother's expression to numerous people that she was unsure whether she wished to take of her daughter; Mother being a ninth grade dropout with no plans of returning to school; and Mother never maintained employment on a consistent basis. Additionally, Mother admitted to drinking alcohol on occasion and although she denied abusing drugs, admitted to experimenting with marijuana.

DFS transferred the case to treatment in June of 2000. Concerns identified by DFS at that stage were Mother's lack of permanent residence, absence of steady employment and Mother's indecision as to whether she wished to plan with DFS toward regaining custody of K. Visitation with Mother was scheduled for June 6, 2000, at 10:00 a.m. but Mother desiring to be out the night before and party with friends, requested visitation be later in the morning, a request turned down by DFS case worker, Susan Murray. When Ms. Murray arrived with K. at maternal Grandmother's home for the 10:00 a.m. visit, Mother was still showering and un-

prepared for the visit. During this visit, Mother advised Ms. Murray that she was not ready to parent K. and that her preference was that someone else parent her child for the next two years until she felt that she would be ready. Mother stated that the parenting of her daughter at this juncture in her life would interfere with her "clubbing" and "partying with friends". Because of Mother's disinterest in planning, DFS entered into no Case Plan with Mother, although Ms. Murray addressed with Mother areas which would require improvement on Mother's part, such as parenting skills, parent education courses, mental health therapy, consistent visitation with K. and Mother obtaining stable housing, items that would have been part of a Care Plan if one had been created. Mother believed that as she could vary her residence between maternal Grandmother or the Y. family as the situation required, she had all the stable housing that she required and so advised Ms. Murray.

Another home visit was scheduled three days later on June 9, 2001, at maternal Grandmother's home with both Mother and K. Mother appeared uncomfortable and disinterested in handling K. and it was Grandmother who spent the majority of the time holding, feeding and changing the infant. On June 20, 2000, a week after the Adjudicatory Hearing in which custody of K. was continued with DFS. Mother failed to appear for the scheduled home visit at maternal Grandmother's home. Mother's excuse for failing to appear for visitation was that she had been out with friends for the weekend and was not able to get back in time. That visitation was re-scheduled for June 28, 2000, at which time Ms. Murray met with Mother at the Y. home where the child was in placement in order to take K. to a doctor's appointment and visitation with Mother. At that meeting, Ms. Murray again brought to Mother's attention the importance of entering into a Case

Plan with DFS but Mother declined, still refusing to make a commitment to having K. in her care. Ms. Murray provided Mother information on location for parenting classes and recommended that Mother resume mental health therapy with a counselor that she had previously treated with during high school and with whom Mother felt comfortable.

Mother finally entered into a Case Plan with DFS on July 10, 2000. The Plan focused on Mother obtaining parenting skills, stress management, interactive nurturing and becoming self-sufficient. Mother was referred to counseling and the services of a parent aid were scheduled to begin in early September in order to increase Mother's parenting knowledge and interaction with K. which, to this point, had been minimal. Mother was instructed to advise DFS exactly where she was living as it had become difficult to locate Mother. Due to continuing conflict with maternal Grandmother, Mother had moved out of her home and taken up residence with the Y.s on what Mother believed to be a permanent basis. Within the week, Mother was requested to leave the Y. home because of disregard for house rules. Mother then relocated to the home of a friend, Regina, and it was not until August of 2000 that DFS learned of Mother's whereabouts when maternal Grandmother, not Mother, contacted DFS to let it be known where Mother was living.

In August of 2000, Eulinda DiPietro, a DFS intensive reunification worker was assigned to the case. Mother was residing back with maternal Grandmother at this time. A visit was scheduled for August 17, 2000 at University Plaza. Like many previous visitations, Mother cancelled. The reason given this time was that a friend had shown up at Mother's house and Mother did not wish to breakup her visit

with a friend for the visit with her daughter.

Gwendolyn Willis, a Parent Aid from Child, Inc. began working with Mother in September of 2000, as part of the Case Plan. Ms. Willis testified that while Mother at times seemed motivated, at times she was not. In the mornings, according to Ms. Willis, Mother would rarely be ready for her visits nor would she show any enthusiasm toward seeing her daughter, engaging in neither hugging nor cuddling with the infant. Ms. Willis encouraged Mother to see her counselor in order to develop some motivation and not to sit home all day as appeared to be Mother's practice. When at one point, Mother expressed interest in returning to school, Ms. Willis obtained the appropriate paper work for Mother, although Mother never completed the application. At trial, Mother testified that she saw no need to complete her education, resented the $35 to $40 it would cost to enroll in school and demanded that her daughter be returned to her first before she would give any further consideration to the matter.

A second Case Plan dated September 20, 2000, was entered into with Mother, again focusing on the same goals, but adding additional goals, such of Mother obtaining self-sufficiency by gaining financial and emotional support. At this point in time, Mother was expressing to DFS her desire to have K. returned to her. Ms. DiPietro discussed with Mother DFS's concerns about the number of boyfriends Mother had been involved and/or living with and the effect that this would have on K. as Mother would routinely refer to these different men as "daddy", no matter how brief or casual Mother's relationship. DFS continued to work with Mother on finding employment, encouraging her to return to school and trying to address Mother's housing issues. Mother expressed disinterest in returning to school claiming she would rather work, although she neither sought nor obtained full-time employment on any regular basis. Mother claimed that she intended to reside full time with maternal Grandmother but would frequently relocate to the homes of friends; each time Mother relocated DFS was forced to suspend visitation in order to conduct necessary background investigations of the individuals with whom Mother was residing, thereby further interrupting the development of any consistent parental visitation pattern.

Weekly visitation was offered to Mother through November of 2000. As before, Mother would periodically cancel visits or failure to follow through with instructions regarding scheduling visitation. For example, visitation was offered to Mother on either Wednesday at the DFS office or Friday in Mother's home, provided that Mother's preference was made known to DFS by Monday so that transportation arrangements could be made. Mother would disregard these instructions and call DFS after the close of office hours on Tuesday evening, leaving a message on the answering machine requesting Wednesday visitation. Such last minute requests came too late to make the necessary arrangements with the foster family and many of these visitations could not be held. When visitations were held, Mother was rarely prepared for the visit, either still in the shower or needing to smoke a cigarette before being willing to visit with her daughter wasting precious time before even picking up a greeting her daughter. Mother was uncertain how to properly bathe or feed her daughter. Mother would attempt to bathe K. while there was still dirty dishes in the sink, inadequate supplies for the bath or very hot water.

While Mother claimed to have read a book on childcare she advised Ms. DiPietro

that she had not learned anything from reading the book that she did not already know. When suggestions were offered to Mother on improving her parenting skills, Mother would become argumentative, stating "you don't have to tell me how to do this, I know how". Mother was and continues to be unable to accept direction without getting resentful, as evidenced by her Mother's testimony at trial that her failure to comply with the DFS Case Plans and her failure to accept assistance from the parent aid was because Mother "can't stand" people telling her what to do.

On November 16, 2000, DFS changed its goal from Reunification with Mother to TPR, subject to its self imposed condition that it plan concurrently with maternal Grandmother and Mother for an additional three months. DFS's thought was that while Mother had totally failed to meet her Plan goals, she could be monitored during the time alternative placement with Grandmother was being considered. In order to strive towards these concurrent objectives, DFS was required to develop a Case Plan with maternal Grandmother due to her prior history with DFS of having been investigated and found to be physically and emotionally abusive towards Mother during Mother's childhood. Beyond maternal Grandmother's past history, DFS expressed more recent concerns, specifically, evidence of current conflicts between Mother and maternal Grandmother, including one heated altercation witnessed by DFS worker, Susan Murray, in which maternal Grandmother physically pushed Mother while berating her about her interest in partying and unwillingness to "settle down". As recently as October 2000, maternal Grandmother advised Ms. DiPietro of DFS that if Mother did not move out of her home, maternal Grandmother was going to harm her. Concerned about both the history of and potential for future conflicts between maternal Grandmother and Mother, the Case Plan with Grandmother entered into on November 22, 2000, focused on issues relating to anger and stress management as well as problem solving skills.

In January of 2001, William Grear the DFS adoption/permanency worker was assigned to work with maternal Grandmother as a potential adoptive resource for K. Throughout the next several months that Mr. Gear worked with maternal Grandmother, Mother never attempted to contact him regarding visitation, nor did mother provide him with a phone number where she could be reached, although he later obtained a phone number for a residence where she was residing with a male friend. On March 28, and April 12, 2001, at DFS's initiation, visitation with Mother was scheduled and Mother, as had happened so many times before failed to appear at either. On April 25, 2001, Mother wrote a letter to Mr. Grear stating that she could not care for K. and that she wished to voluntarily relinquish her parental rights so that the foster parents, the Y.s could adopt her.

During this same period of time, Grear personally came to observe the conflict between maternal Grandmother and Mother, on one occasion witnessing maternal Grandmother's yelling at Mother in front of both K. and Grear. While maternal Grandmother was aware that from DFS's prospective, her ability to gain control of her anger and manage her stress was critical to DFS agreeing to place K. with her, she never demonstrated sufficient progress to convince DFS that Grandmother would be an appropriate adoptive resource. As a result, finding a permanent safe non-relative adoptive resource became DFS's goal for K.

During the time period that Grear had this case, Mother never maintained stable

housing, residing in five different homes, never held a steady job, failed to attend counseling, and never developed a pattern of regular consistent visitation with her daughter. From Grear's perspective, this was unfortunate because while DFS was planning with maternal Grandmother, both Grear and the CASA had informed Mother that if she complied with her Case Plan, DFS would reconsider changing the goal back to reunification with Mother. Having been given another chance by DFS, that is, being made aware that DFS would reconsider changing goal back to reunification with Mother, nevertheless, neither Grear, nor Margaret Smith, the child's Court Appointed Special Advocate, ever saw Mother make but minimal improvements in parenting before regressing. On only one occasion during the entire period of time this child was in DFS custody was Mother's ability to care for her child deemed adequate enough to permit overnight visitation.

Today, Mother is back residing with maternal Grandmother. As of the February 12th hearing date, Mother had been employed for 5 consecutive weeks at McDonalds working less than 8 hours per week. Prior to working at McDonalds, Mother had worked at Burger King for a period of 2 months before being fired, her longest period of employment to date. Mother testified that while she acknowledged making some bad decisions, hanging out with "druggies", "drinking and smoking weed" and missing visitations with K., Mother nevertheless asked the Court to find that she is ready to parent K. Moth-

er advised the Court that she is again considering returning to school at some point in the indefinite future, although no details were given. Mother is presently not attending counseling nor receiving any mental health treatment. She is unaware whether her employer provides health care benefits. Mother does not drive and is totally dependent upon maternal Grandmother and others for transportation.

Since the creation of the Case Plan with Mother in July of 2000, Mother has missed visitations, left her whereabouts unknown for weeks at a time and maintained at least six different residences. Notwithstanding the requirements for the July 10, 2000, Case Plan, Mother did not complete the 12 hour parent education program until November of 2001. While Mother had been employed at a half a dozen jobs, none lasted more than a few weeks and, at the time of trial in this matter, Mother's total income from part-time employment is less than $200.00 per month. Mother readily admits that she has never complied with the terms of the Case Plans designed to enable K. to be reunified with her.

K. is a happy, social, outgoing and developmentally on track 2 year old. She is currently residing in a pre-adoptive foster home placement and is well adjusted to the family.

## CONTENTIONS OF THE PARTIES

DFS argues that it has met its burden of establishing by clear and convincing evidence that there has been a failure to plan[1] on the part of K.'s parents and that it is in K.'s best interest to terminate

---

1. 13 *Del.C.* § 1103(a) provides:
    "(a) The procedure for Termination of Parental Rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated when-

ever it appears to be in the child's best interest and that 1 or more of the following grounds exist:
    (5) The parent or parents of the child, or any person or persons holding parental rights over the child, are not able, or have failed to plan adequately for the child's physical needs or mental and

parental rights and free this child for adoption. In support of this contention, DFS asserts that Mother was provided every opportunity to address the issues that were preventing her from effectively parenting her child but that she failed at each of the issues that required addressing: housing, employment, parenting and counseling. DFS argues that as Mother concedes she has failed to meet these objectives she is merely asking the Court for another chance with nothing to justify such consideration. With regard to K.'s best interest, both Petitioner and CASA argue that this child requires both stability and love and that such stability, in the case of K., constitutes adoption by a parent who is financially, educationally and emotionally prepared to take care of this child at the present time rather than at some speculative future date.

Mother argues that the State has not met its burden of proof, that the State's initial taking of this child was unfounded and that it is inappropriate to terminate parental rights based upon the failure to live by timelines and check lists which Mother contends are at the heart of the DFS culture. While Mother concedes that she is not capable of parenting K. at this time, she asserts that she is much better off today than she was 2 years ago, has moved forward and is closer to reaching the necessary standard. Mother argues that as she is currently living with maternal Grandmother, it is in K.'s best interest to remain with Mother and her extended family.

## ANALYSIS

### A. Statutory Grounds.

■ In Delaware, in order to terminate parental rights, the Court must perform a 2 tiered analysis. First, there must be proof of an enumerated statutory basis for

> emotional health and development, and 1 or more of the following conditions are met:
> a. In the case of a child in the care of the Department or a licensed agency
> 1. The child has been in the care of the Department or licensed agency for a period of 1 year or for a period of 6 months in the case a child who comes into care as an infant, or there is a history of previous placement or placements of this child; or
> 2. There is a history of neglect, abuse or lack of care of the child or other children by the respondent; or
> 3. The respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration, except that the Court may consider posted-conviction conduct of the respondent; or
> 4. The respondent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the respondent's financial means; or
> 5. Failure to terminate the relationship of parent and child will result in continued emotional instability or physical

> risk to the child. In making a determination under this paragraph, the Court shall consider all relevant factors, including:
> A. Whether the conditions that led to the child's placement, or similar conditions of a harmful nature, continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the respondent to discharge parental responsibilities so that the child can be returned to the respondent in the near future;
> B. The respondent's efforts to assert parental rights of the child, and the role of other persons in thwarting the respondent's efforts to assert such rights;
> C. The respondent's ability to care for the child, the age of the child, the quality of any previous relationship between the respondent and the child or any other children;
> D. The effect of a change of physical custody on the child; and
> E. The effect of a delay in termination on the chances for a child to be placed for adoption.
> ..."

termination. Second, there must be determination that severing the parental rights is in the best interest of the child. *Division of Family Services v. Hutton,* Del. Supr., 765 A.2d 1267, 1271 (2001); *Shepherd v. Clemens,* Del.Supr., 752 A.2d 533, 536–537 (2000) (*en banc*). Additionally, the Court must be satisfied that there has been meaningful compliance with the Child Welfare Act of 1980 § 608, 620–629, 670–676 and the corresponding Delaware Statute, 29 *Del.C.* § 9003(a)(2)(3). These laws require that the Court review whether the State developed a meaningful Case Plan to guide a parent through the process reasonably designed to help the parent be reunited with the child, and also to be sure that the state has made reasonable efforts to reunify the family or prevent out of home placement. 32 *U.S.C.A.* § 675(1) and § 671(a)(15).

While the Child Welfare Act of 1980 focuses on the protection of parents' rights, the Adoption and Safe Families Act of 1997 (ASFA) emphasizes the importance of promoting the safety of the child and the child's needs for permanency by placing limits on the time in which parents are given to rehabilitate themselves and assume their parental responsibilities, provided that the State has met its duties to provide a meaningful process and reasonable efforts to reunify the family. *In the Interest of: K.L.T.,* Del.Fam. Ct., No. 99–12–05 TPR, Henrikson, J. January 22, 2001, 2001 WL 493113.

Because parental rights arise from a natural relationship between parent and child which the law has traditionally recognized as fundamental liberties, these rights may not be abrogated in the absence of the most compelling reasons. *In re: Kelly Stevens,* Del.Supr., 652 A.2d 18 (1995); *In re: Burns* Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Child Protective Services,* Del.Supr., 470 A.2d 723, 726 (1983). The process in Delaware requiring proof of both an enumerated statutory ground and a determination that severing the parental tie that would be in the child's best interest has been recognized by our Courts to require a showing by clear and convincing evidence that the parent is unable to meet the statutory guidelines. *In re: Hanks* Del.Supr., 553 A.2d 1171, 1178 (1989). This standard, rather than the traditional "preponderance of the evidence" standard of those civil proceedings ensures that a parent only sacrifices their sacred right of parenthood to their equally sacred obligation owed to the child. *Patricia A.F. v. James R.F.,* Del.Supr., 451 A.2d 830, 831 (1982).

As of the date of the hearing, K. had been in the State's care for all but one of the 23 months of her life. She initially came into care when Mother left her with a friend because she was unable to care for the child. A month later, at the Adjudicatory Hearing on June 14th, Mother conceded that K. was dependent as defined by 10 *Del.C.* § 901(8) [2] and that it was in K.'s best interest that she remain in the custody of the Division of Family Services. The Court's first inquiry must therefore be

---

**2.** 10 *Del.C.* § 901:

. . .

"(8) 'Dependent child' means a child whose physical, mental or emotional health and well-being is threatened or impaired because of inadequate care and protection by the child's custodian who is unable to provide inadequate care for the child, whether or not caused by that child's behavior; provided, however, that for the purposes of this chapter,

dependent child may include a child who has been placed in a non-related home on a permanent basis without the consent and approval of the Division of Child Protective Services or any agency licensed thereby to place children in a non-related home, or who has been placed with a licensed agency which certifies that it cannot complete a suitable adoption plan."

whether Mother is able or has failed to plan adequately for the child's physical needs or mental and emotional health and development. The evidence is clear and convincing to the Court that Mother has failed to plan adequately for this child's physical needs or mental and emotional health and development. With regard to the child's physical needs, that is food, clothing, health care and shelter, Mother is not capable for providing these for herself, let alone for her daughter. With regard to shelter, Mother is totally dependent upon others to provide it for her. During the past two years, she has lived with numerous friends, acquaintances and "boyfriends", leaving one for the other as her whims dictate or her relationships deteriorate. Mother has for several months been residing back in the home of maternal Grandmother. While Mother could argue that residing with Grandmother addresses the issue of stable shelter, Mother does not. At best, Mother regards living with Grandmother as one of several options available to her, depending on Mother's satisfaction with that environment at a particular time. Mother's residence with Grandmother is not out of choice, but out of necessity. She is there totally at the whim of Grandmother who, on several occasions has threatened to put Mother out. Furthermore, Mother does not believe there is a necessity of providing stable housing for her daughter, having testified that she sees nothing wrong with moving around from temporary residence to temporary residence.

Mother and child residing with Grandmother in and of itself poses a threat to the child's emotional well-being. Mother and maternal Grandmother have a long history of conflict going back to Mother's childhood days, which repeatedly manifested itself during Mother's recent residency with Grandmother, to the extent that there have been physical altercations between the two of them and verbal threats made by Grandmother. There was evidence presented at the hearing that Mother's limited parenting skills actually declined when she was residing with Grandmother, apparently as a result of Mother being content to abdicate her responsibility to her daughter to maternal Grandmother's control. Only when Mother had visitation with K. absent the presence of maternal Grandmother did Mother exhibit even minimal interest in interacting with her daughter.

Mother has no ability to provide financial security for K. Mother cannot afford to provide housing or food for herself and her daughter; working less than 8 hours per week she brings home approximately $160.00 a month. She has never held full time employment for more than 2 months. Her ability to obtain decent regular employment is hampered by having only a ninth grade education, yet Mother sees absolutely no value in obtaining a GED or high school diploma, having rejected efforts by DFS to have Mother enroll in school. Mother's ability to be employed is further hampered by her dependence upon others for transportation. Mother, while possessing a driver's license, does not drive. Residing with maternal Grandmother in rural New Castle County along Route 13 away from regular lines of public transportation makes Mother dependent upon others to get to work. Presented with opportunities that would have lessened Mother's dependence upon others, such as relocating to a shelter where Mother could receive services and live with her daughter, Mother rejected this option. Mother currently has no health insurance, has no knowledge as to whether health insurance is available through her current employer, and expressed no interest in finding out. Mother indicated that she was unaware whether she was still covered by Medicaid ignoring as simple an element of daily adult routine as regularly checking one's mail to find out.

While Mother did complete the specified 12 hour parenting course, the Court notes that it took Mother 2 tries and a year and a half to complete the course and that Mother had only completed the course in November of 2001, a few weeks before the original TPR Hearing date, and one half year after the Petition to Terminate Mother's Parental Rights was filed. Mother has failed to seek counseling that was a condition of her Case Plan and which she so obviously needs, with no reasonable justification. Mother's unacceptable excuses range from having inadequate time due to her employment and Court hearing to being unable to obtain the name of a counselor, notwithstanding the fact that she has on occasion counseled with Blaine Morris. Mother's failure to make even rudimentary attempts at obtaining the skills necessary to reach the minimal levels required for parenting are the result of what Mother herself expressed at the trial, her resentment of and refusal to take direction from people "telling her what to do". Mother's characterization of suggestions by DFS case workers, the parent aid, and even the CASA, all designed to assist Mother in obtaining the minimal skills and abilities necessary to parent her daughter as "telling her what to do" and refusing to comply coupled with Mother's setting her own ultimatum that she get her child back first before she considers complying with the Case Plan evidences Mother's total lack of the minimum maturity necessary to parent a child.

Petitioner's Case Plan was reasonable, its goals appropriate. The goals as stated on the first Case Plan included visiting regularly with K. during which time Mother was to demonstrate good, age appropriate interaction; continue counseling to address the stress that Mother encounters in her relationship with maternal Grandmoth-er; meet with the parent aid to learn better parenting skills; and make DFS aware of any changes in her living situation. To these, the Case Plan of September 20, 2000, added obtaining employment and fulfilling her job responsibilities in order to meet the financial needs of her daughter. Even Mother concedes that she has not met these goals. The failure of Mother to meet these goals is not the result of the failure of the state to provide a meaningful process and reasonable efforts to reunify the family, but the result of the refusal of this young Mother to accept the responsibilities of parenthood. The evidence in this regard is overwhelming.

### B. Best Interest.

█ Having concluded that at least one statutory ground for Termination of Parental Rights has been established in this case, that of, the failure to plan under 13 *Del.C.* § 1103(a)(5) a. 1., while the child has been in the care of the Department for a period of at 6 months, the Petition for Termination nevertheless cannot be granted unless the Court further finds, by clear and convincing evidence that Termination of Parental Rights is in this child's best interest. *In re: Burns,* Del.Supr., 519 A.2d 638; *Division of Family Services v. Hutton,* Del.Supr., 765 A.2d 1267 (2001). While what constitutes "best interest of the child" depends on the particular facts in any given case, the Court, while considering all relevant factors, must include consideration of the factor set forth in 13 *Del.C.* § 722 [3].

(1) *The wishes of the child's parent or parents as to his or her custody and residential arrangements.*

Father expressed no interest in this child and refused to plan with DFS. Moth-

---

**3.** 13 *Del.C.* § 722 provides in relevant part:

"(a) In determining the best interest of the child, the Court shall consider all relevant

er initially expressed the desire that someone else take care of K. until Mother felt she was ready, and prophesized that that would be in about 2 years. While taking no initiative to seek visitation beyond that which was scheduled, and frequently failing to take advantage of the visitation that was provided her, Mother now professes interest in having her daughter returned to her. While the Court questions the depth of Mother's sincerity on this point in light of her demonstrable history of disinterest as well as refusal to seek the necessary experience and skills needed to carry out the responsibilities that coexist with the rights of parenthood, nevertheless, Mother's expressed wishes at this point and time weigh against TPR.

(2) *The wishes of the child as to his or her custodian and residential arrangements.*

As K. is too young to express an opinion on this point, this factor is of no bearing.

(3) *The interaction and interrelationship of the child with his or her parents, grandparents, siblings, parents cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interest.*

K.'s only interaction with family has been with Mother and maternal Grandmother. While K. is described as a happy well adjusted child, and there clearly has been nothing negative presented with regard to the child's interaction with either Grandmother or Mother, Mother's exercise of visitation and her interaction with K. has been less than promising. All too often, visitation conflicted with Mother's self-interest. Mother's desire to be up late at night and party with friends over rode her responsibility than get up in the morning to be a parent to her daughter. Mother placed visiting with adult friends ahead of visiting with her daughter. Frequently missing scheduled visitations, Mother showed no interest in making up the missed time with her daughter. The scheduling of visitations were always initiated by DFS, never by Mother. During visitations, while Mother's behavior may have been appropriate, her interaction was minimal, and weakest occurring during when Mother was living with Grandmother, who usurped Mother's position as primary caregiver to the child. The Court notes that during the past two years, K.'s interaction with Mother and Grandmother has been limited to approximately one hour sessions, Mother having earned but one overnight visitation in two years. The nature and limited extent of the child's interaction with Mother and Grandmother weighs in favor of Termination of Parental Rights.

factors including:
(1) The wishes of the child's parents or parent as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian(s) and residential arrangements;
(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interest;
(4) The child's adjustment to his or her home, school and community;
(5) The mental and physical health of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;
(7) Evidence of domestic violence as provided for in Chapter 7A of this title.

(4) *The child's adjustment to his or her home, school and community.*

K. is not of school age. She is currently residing in a pre-adoptive home where it is reported that she appears to be happy and well adjusted, although no direct testimony was presented by the foster family. This factor weights somewhat in favor of Termination of Parental Rights.

(5) *The mental and physical health of all individuals involved.*

Mother appears generally to be in good physical health, although she was recently treated at the emergency room for a ruptured ovarian cyst. Mother testified that she suffers from borderline "cancer of the cervix" and that she believed that this may affect her ability to bear children in the future. No medical evidence was presented as to what was meant by "borderline", the likelihood of Mother's condition ripening into cancer, the treatment that might be required, or the effects on Mother's ability to parent or her life expectancy. With regard to Mother's mental health, Mother who is currently eighteen, has a history of depression and has been hospitalized for suicidal thoughts. Notwithstanding ongoing recommendations for counseling, and Mother's acknowledgement that the recommendation of counseling was appropriate, Mother has failed to attend counseling on any consistent basis, and has attended only a handful of sessions, none of them recently. Grandmother, in whose home Mother currently resides, has had a few sessions of counseling to deal with issues relating to her stress and recently attended an anger counseling program. While the seeking of professional help to deal with issues relating to stress, anger, depression and other mental health issues is of positive value, the failure of Mother to seriously address treatment for mental health issues, weighs

against Mother and in favor of TPR in this regard.

(6) *Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this Title.*

Except for the first four weeks following K.'s birth, Mother has never exercised any responsibility of support, care, nurturing or education of K., having allowed her responsibilities to be excused by others, in accordance with Mother's expressed desires at the time the child came into care. Mother has likewise failed to exercise her right of visitation on any consistent basis.

(7) *Evidence of domestic violence as provided for in Chapter 7A of this Title.*

This factor is neither a positive nor negative influence with regard to K.'s best interest, as there have been no documented instances of adjudicated domestic violence.

(8) *Other considerations.*

Every child is entitled to a stable, safe, nurturing and supportive environment provided by parents or other caregivers who fully recognize and accept their parental responsibilities and are willing and able to meet the child's needs in this regard. While these are obviously laudable goals, and, in a perfect society, would be attainable for every child, all too often they remain a promise rather than a guarantee. Nevertheless their importance as goals which one should seek to attain, and as standards against which a child's best interest should be measured are not diminished thereby. Where a parent, for any number of reasons, is unable to achieve these goals, the Court should nevertheless not ignore the potential of such parent to improve to the extent they are able to

meet such goal in the child's foreseeable future or underestimate the value of such parent's efforts toward compliance in considering the child's best interest. The creation or the maintenance of a relationship between parent and child cannot be measured solely in the present but must be considered in the context of the future as well. The Court should therefore give appropriate weight to the actions taken by a parent in striving to obtain the experience and skills necessary to meet his or her child's needs, even if the parent presently falls short of attaining that goal provided that there is a likelihood the parent will reach that goal in sufficient time to create a stable environment for and relationship with the child in a timely and long lasting manner.

In this case, the Mother professes to love K. and now desires to have her back. The Court doesn't question this Mother's love for her child. But emotions aside, the evidence clearly establishes that Mother not only fails to possess the ability to presently meet this child's minimal needs, but has taken no significant steps during the past two years to gain the ability to do so. She lacks the financial resources to provide for her child but cannot or will not seek and maintain full time employment to discharge her financial responsibilities. She lacks the education necessary to obtain decent employment, but refuses to enroll in any educational program designed to eliminate that disability. She recognizes her need for counseling to deal with issues relating to her relationship with her mother as well as her daughter, but refuses to attend such counseling. While Mother cites her young age at the time of K.'s birth and past immaturity as the cause of her failure to progress toward meeting her daughter's parental needs, she presents no evidence upon which the Court can conclude the future will be any brighter for K. if left in Mother's care. In essence, Mother asks the Court to focus on what Mother believes is in the best interests of Mother, and perhaps even maternal Grandmother, while failing to recognize now, as she has for the past two years, that it is K.'s best interest upon which the Court must be concerned. The Court cannot ignore the overwhelming evidence of Mother's lack of commitment and utter failure of action during the past two years, notwithstanding Mother's expressions of love towards the child. K. is entitled to and the law requires that there be more than mere empty promises.

Nor does the Court view Mother's resumption of residence with maternal Grandmother as a possible solution. Residing in Grandmother's home may provide Mother with temporary shelter, but at what expense. Living there subjects Mother to complete dependence upon maternal Grandmother for food, transportation and the ability to be employed in addition to shelter. Grandmother's residence lacks sufficient number of bedrooms, Mother having indicated that if K. were returned to her there, Mother would sleep in the living room; it provides no access to public transportation which Mother requires in light of Mother's inability to drive and the expressed reluctance by maternal Grandmother to assist Mother in Mother gaining driving experience through the use of Grandmother's automobile; and ultimately residing there would place K. back in an environment with an established history of interpersonal conflict as well as physical and emotional abuse. Allowing this will not serve this child's best interests.

Taking into consideration all of these factors the Court is convinced that K.'s best interest will be served by the termination of Respondents' parents parental rights so that she may be freed for adoption.

## CONCLUSION

The Court finds that Petitioner has established by clear and convincing evidence that respondents[4] are not able or have failed to plan adequately for K.'s physical needs or mental and emotional health and development and that K. has been in the care of Petitioner in excess of 20 months at the time of the hearing thereby meeting the grounds specified in 13 *Del.C.* § 1103(a)(5). The Court further finds that the evidence is clear and convincing that it is in the best interest of K.X.X. that respondents' parental rights be terminated and transferred to the Division of Family Services of the Department of Services for Children, Youth and Their Families, so that K. can be freed for adoption or other permanency plan. An Order to that effect will be entered concurrent with the issuing of this decision.

4. While the Court made a finding by default that the statutory ground of failure to plan had been met against Father, evidence presented at the hearing was that Father refused to enter into any Plan with DFS for the care of K., and was never a factor in this child's life, thereby supporting the finding that it is in the child's best interest that Father's parental rights be terminated as well.