**DIVISION OF FAMILY SERVICES, Defendant Below, Appellant,**

v.

**Terry HUTTON, Plaintiff Below, Appellee.**

**No. 196,2000.**

Supreme Court of Delaware.

Submitted: Dec. 5, 2000.
Decided: Jan. 26, 2001.

Kevin R. Slattery, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for appellant.

Daniel G. Atkins, Community Legal Aid Society, Inc., Wilmington, Delaware, for appellee.

Before VEASEY, C.J., BERGER and STEELE, JJ.

**PER CURIAM:**

This is an appeal from a final judgment of the Family Court. The petitioner-appellant is the Division of Family Services (the "DFS"). The Family Court denied a petition by the DFS to terminate the parental rights of Terry Hutton ("Mother") with respect to her infant daughter, Quintana Hutton.[1] The DFS contends on appeal that the Family Court did not properly analyze the statutory grounds for termination of parental rights under 13 *Del.C.* § 1103(a)(5). The DFS also contends that the Family Court's finding that termination of parental rights would not be in the child's best interest is not supported by the record, and that only a plan for adoption (as opposed to guardianship) is in the best interest of the child.

We conclude that the record supports the Family Court's findings as to Quintana's best interests. Furthermore, we do not agree with the DFS that adoption is the only viable option for Quintana. Accordingly, the judgment denying termination of parental rights is affirmed. We also find that the Family Court erred in its statutory analysis. In light of our conclusion regarding Quintana's best interests, this error does not require reversal.

### Facts

Quintana Hutton was born on April 27, 1996. At the time of Quintana's birth, Mother was 19 years old. Mother had been born into a home where she had suffered physical abuse and rape. Following DFS intervention, Mother had spent her early childhood years living in the care of her grandmother. When her grandmother died, Mother lived on the street for a time. DFS placed Mother in the Murphy School in Dover when she was thirteen. Mother was hospitalized for a short time when she was fifteen because of her "severe mood swings" and "wanting to hurt herself." Mother stayed at the Murphy School until she graduated at age eighteen. Shortly after leaving the Murphy School she became pregnant, resulting in the birth of Quintana.

A psychological evaluation of Mother determined that she is suffering from post-traumatic stress disorder as a result of the sexual and physical abuse she sustained as a child. Mother also exhibited signs of depression. She was diagnosed as mildly mentally retarded based on a WAIS–R test, which determined her IQ as 64, but she functions at a level higher than her cognitive ability.

Quintana, Mother's only child, first came to the attention of DFS on June 28, 1996, when the DFS received a hotline report from St. Francis Hospital that Quintana, then three months old, had sustained a dislocated shoulder. At that time, Mother had no stable residence and was living with her aunt in reportedly difficult conditions. The DFS investigated the hotline report, and based on a finding of significant risk to the child, the DFS removed Quintana from the home and filed for sole custody.

Before the decision on the custody of Quintana, DFS entered into a case plan with Mother requiring her to fulfill a number of responsibilities including the following: attending parenting classes, obtaining stable housing, and attending medical appointments for Quintana. Mother had partially complied with this case plan.

In August 1996, after a Family Court Master granted joint legal custody between DFS and Mother; Quintana was placed with her Mother because DFS "presented no evidence to even suggest that the mother has abused the child." Quintana and Mother remained together until December 1996. In this time period, Mother completed her parenting classes, there was a parent educator involved in the case, a public health nurse came to Mother's

---

1. To protect the identity of the mother and the minor, the names used in the opinion are pseudonyms. Supr.Ct.R. 7(d).

home on a weekly basis, and the child was in protective daycare. There is evidence that at this time Mother began to leave the child in the care of a non-relative who worked at Quintana's daycare. Quintana was placed by the DFS in the care of the non-relative after a social worker discovered scratches on Quintana's face, and Mother was acting negatively toward Quintana.

In February of 1997 and again in October of 1997, DFS and Mother agreed to try a dual placement that was certified by both DFS and the Division of Mental Retardation ("DMR"). The first placement with Radethia Thompson was unsuccessful. Mother left after a month, and Quintana was placed in foster care. Mother signed an agreement setting forth specific conditions of the placement. Mother soon began to violate these conditions. For example, she would stay out overnight and on weekends without informing DFS of her whereabouts, and frequently neglected to supervise and feed the child. In March 1997, Mother left the placement, and DFS placed the child in foster care.

Based on the failure of this placement and on various assessments of Mother's parenting skills provided by workers involved with the case, the DFS considered recommending a termination of parental rights. Mother protested against the recommendation, and DFS agreed to try another joint placement.

The second placement required Mother to live in the home without Quintana first and to learn to abide by the rules of her agreement. The child was then placed in the home with Mother in January 1998 at which point Mother had to abide by the added agreement and case plan. Again this placement was unsuccessful. According to testimony, Mother sometimes treated the child harshly, and the child continued to have unexplained injuries. Additionally, there were unexplained absences and missed appointments. By June 1998, Mother voluntarily left the placement and moved in with her aunt.

Following the failure of the second joint foster home arrangement, Quintana was placed with a foster parent. This placement did not go well, and Quintana was then placed in her present foster home with Barthenia Rochester. The parties appear to be in agreement that the placement with Ms. Rochester has provided Quintana with a stable and healthy environment. According to testimony, Quintana has developed a loving relationship with Ms. Rochester and gets along well with Ms. Rochester's teenage children. Mother also appears to have a good relationship with Ms. Rochester, and visits regularly with Quintana in Ms. Rochester's home. Ms. Rochester has stated that she would consider guardianship or adoption as permanency options for Quintana. As of September 22, 1999, Mother was living in an efficiency apartment.

A termination of parental rights hearing was held on December 7 and 8, 1999, and February 23, 2000. The DFS contends that Mother does not have and is incapable of developing a parenting relationship with Quintana, that Mother's capacity for explosive behavior presents a danger to the child, and that allowing Mother's continued involvement as a parent threatens to disrupt the successful placement finally achieved. At the hearing, DFS presented twelve witnesses: five DFS case workers or supervisors, one DFS contracted parent aide, two DFS foster parents, a public health nurse, a case worker from the DMR, and two expert witnesses.

Mother conceded at the hearing that the statutory criteria for failure to plan were met and that DFS had made reasonable efforts to reunify Mother and Quintana. Mother's only defense was that it was not in Quintana's best interest to have the parental rights terminated. Hutton presented two witnesses, a DFS contracted parent aid, and an expert witness. Additionally, the Court Appointed Special Advocate also testified to what was in Quintana's best interest. As we explain below, the testimony given at trial supports the Fami-

ly Court's finding that termination would not be in Quintana's best interests.

## Statutory Analysis

 Preliminarily to addressing the merits of the Family Court's best interest determination, we note that the Family Court followed an improper statutory analysis in this case. Under Delaware's statutory scheme, the standard for terminating parental rights provides for two separate inquiries.[2] "First, there must be proof of an enumerated statutory basis for the termination. Second, there must be a determination that severing the parental right is in the best interest of the child." [3] Thus, before proceeding to the best interests analysis, the Court must find by clear and convincing evidence that one of the statutory grounds for termination has been met.[4]

One of the statutory bases for termination of parental rights, and the one relevant to this case, is failure to plan. Under 13 *Del.C.* § 1103(a)(5), the Family Court must determine both that there has been a failure to plan and that one or more enumerated conditions exist.[5] The statute clearly requires only one of the enumerated grounds to be met.

In this case, Mother conceded failure to plan. The Family Court focused directly on the remaining grounds set forth in section 1103(a)(5)a, as required by the Statute. The Family Court found that section 1103(a)(5)a.1 was established because the child had been in the custody of the DFS for more than a year. Although this finding alone provides the statutory basis for proceeding to the best interests analysis, the Family Court proceeded to examine whether the other remaining statutory conditions had been met. Thus, the Family Court concluded that Mother was unable to assume prompt legal and physical custody of the child and unable to pay for the child, a statutory factor supporting termination.[6] On the other hand, the Family Court found that the State had not established either a history of abuse or neglect[7] or that failure to terminate the relationship of parent and child would result in

2. *See Shepherd v. Clemens*, Del.Supr., 752 A.2d 533, 536–37 (2000) (*en banc*).

3. *Id.*; 13 *Del.C.* § 1103(a).

4. *Shepherd*, 752 A.2d at 536; *see also In re Kelly Stevens*, Del.Supr. 652 A.2d 18, 25 (1995).

5. 13 *Del.C.* § 1103(a)(5) provides, in relevant part, that:

 The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears in the child's best interest and that 1 or more of the following ground exist:
 (5) The parent or parents of the child, or any person or persons holding parental rights over the child are not able, or have failed to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met:

 a. In the case of a child in the care of the Department or a licensed agency;
 1. The child has been in the care of the Department or licensed agency for a period of one year or for a period of six months in the case of a child who comes into care as an infant, or there is a history of previous placements of this child; or
 2. There is a history of neglect, abuse, or lack of care of the child or other children by the respondent; or
 3. The respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration, except that the Court may consider post-conviction conduct of the respondent; or
 4. The respondent is not able or willing to assume the promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the respondent's financial means; or
 5. Failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child . . .

6. *See* 13 *Del.C.* § 1103(a)(5)a.4.

7. 13 *Del.C.* § 1103(a)(5)a.2.

continued emotional instability or physical risk to the child.[8]

It is of course proper for the Family Court to have found more than one statutory basis for termination. Such findings provide alternative statutory grounds for termination of parental rights once termination is found to be in the child's best interest. It is likewise proper for the Family Court to explain its rejection of any statutory grounds raised by the petitioner for which the Family Court does not find support. The Family Court's ruling, however, reflects an erroneous view that each condition enumerated in section 1103(a)(5) must be satisfied in order to find failure to plan.

■ We say this for two reasons. First, we find in the Family Court's ruling no recognition that an extended analysis of those prongs that were *not* satisfied would have no effect on the analysis since the Family Court had already found that at least one ground was satisfied. Instead, the Family Court, referring to section 1103(a)(5)a.5, noted the DFS' failure to establish the "final prong of the failure to plan." Second, the Family Court stated that "[e]ven if the Court found that the mother has conceded for failure to plan [sic], I think the Court next has to go to best interest." It appears from this that the Family Court concluded that failure to plan had not been shown, a conclusion reflective of the view that each prong must be satisfied. Thus, the statutory analysis by the Court was erroneous, but this error was harmless in light of the fact that the termination of parental rights in this case is not in the best interest of the child.

### Bests Interests Analysis

■ Even when there is a statutory ground for termination of parental rights, the petition for termination will not be granted unless it is in the child's best interest. It must be proven by "clear and convincing evidence that termination of parental rights is essential to the child's welfare." [9] The best interest determination "necessarily depends upon the facts in the context in which the petition is presented." [10] In making the determination, the Family Court must consider all relevant factors, including those set forth in 13 *Del.C.* § 722.[11] We review the grant or denial of a termination petition to assure that they are sufficiently supported by the record and result from an orderly and logical deductive process.[12]

■ We find that the record supports the conclusion of the Family Court that termination of Mother's parental rights would not be in Quintana's best interest. Concerning the wishes of Mother,[13] the Court found that while Mother had exhibited difficulty acting in the best interests of the child and was not seeking custody, she still wished to play a role in Quintana's life. This finding rested in part on the testimony of Dr. Turner, a psychologist, who testified that Mother was aware of her limitations and had demonstrated both willingness and ability to overcome them. The Family Court also found that accord-

8. 13 *Del.C.* § 1103(a)(5)a.4.

9. *In re Burns*, Del.Supr., 519 A.2d 638, 643 (1986) (citation omitted).

10. *Daber v. Div. of Child Protective Services*, Del.Supr., 470 A.2d 723, 726 (1983).

11. Section 722(a) provides that:

In determining the best interests of the child, the court should consider all of the relevant factors, including: 1) The wishes of the child's parents as to her custody; 2) The wishes of the child as to her custodian; 3) the interaction and interrelationship of the child with his or her parent …; 4) the child's adjustment to her home, school, and community; 5) the mental and physical health of all individuals involved; 6) Past and present compliance of the parents under Section 701 of Title 13 of the Delaware Code; and 7) Evidence of domestic violence as provided in Chapter 7A of this title.

12. *See In re Kelly Stevens*, Del.Supr., 652 A.2d 18, 23 (1995); *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

13. 13 *Del.C.* § 722(a)(1).

ing to the testimony of Ms. Rochester, the current foster caregiver, Mother had been maintaining a schedule of weekly visits with Quintana.

The Court next considered the child's wishes.[14] A Court Appointed Special Advocate (CASA) testified that Quintana "looks forward" to her Mother's visits. The CASA also testified that while Mother should not have custody of Quintana, continuing visits "provide a plus," and termination would not be in Quintana's best interest. This testimony supports the Family Court's conclusion that this statutory factor favors denial of the petition.[15] The Family Court further found that the positive interactions between Mother and Ms. Rochester,[16] and Quintana's successful adjustment to living with Ms. Rochester and being visited by her Mother [17] favored denial of the petition. We recognize that there was conflicting testimony concerning the nature of Mother's relationship with Quintana and the prospect that Mother might develop her parenting skills. Nonetheless, in light of the Family Court's findings, which are supported by the record, we do not agree with the DFS that the Family Court's analysis is without support.[18]

■ The DFS also argues on appeal that the Family Court did not give due to consideration to the importance of giving Quintana the chance for a permanent relationship with a caregiver. The DFS argues that the only way to achieve this is through adoption by Ms. Rochester, which of course entails termination of Mother's parental rights. This argument is based on the view that, as the Family Court acknowledged, Mother has engaged in erratic and sometimes harmful behavior that threatens to interfere with the current placement with Ms. Rochester. The DFS also cites Ms. Rochester's testimony that while she sees Mother playing a role in Quintana's life, that role should be sharply limited.

As we have stated, "one of the important objectives of the termination of parental rights statute is to ensure that children are not denied the opportunity for a stable family life." [19] "Permanency is defined as the safe, stable, custodial environment in which a child is raised, and the life-long relationship that child established with a nurturing caregiver." [20] With this principle in mind, we turn to the present case.

We have carefully reviewed the Family Court's ruling, and we conclude that the Family Court's decision to deny the termination takes into account the importance of permanency. The Family Court found that Ms. Rochester is "committed to [the] child and ... wants that child to be a permanent part of her life." The Family Court also found that Ms. Rochester wants Quintana to continue to have some interaction with Mother. Thus, the Family Court reached the conclusion that this is not "a case where the child is going to be left in limbo." Furthermore, the DFS' own policy guidelines support guardianship as a viable option when "the child cannot be returned home ... or when it has been determined that adoption is not ... in the best interest

---

14. 13 *Del.C.* § 722(a)(2).

15. At the time of the hearing, Mother was expecting a baby, and the CASA emphasized and was clearly influenced by her belief that Quintana was excited about and would benefit from having a baby sibling. By the time the Family Court ruled, however, the Mother's pregnancy had ended in a miscarriage. When made aware of this fact, the Family Court stated that its ruling would not change, because "the major finding is that the child has a biological link to the mother and that link should be preserved."

16. 13 *Del.C.* § 722(a)(3).

17. 13 *Del.C.* § 722(a)(4).

18. *Stegemeier v. Magness*, Del.Supr., 728 A.2d 557, 561 (1999) (*en banc* ).

19. *Shepherd*, 752 A.2d at 538 (citing *In re Hanks*, Del.Supr., 553 A.2d 1171, 1179 (1989)).

20. *Id.*

of the child." [21]

Adoption is not in the best interest of the child in this case, but a guardianship would provide Quintana with the "safe, stable, custodial environment" in which to be raised that rises to the level of permanency. This is a case where the foster mother testified that she wants Quintana to be a permanent part of her life, and she would consider adoption or guardianship. Therefore, we cannot conclude that the Family Court was required to grant the termination petition in order to further Quintana's vital interest in a permanent relationship.

Accordingly, the judgment of the Family Court is affirmed.

---

21. DFS argues that Quintana will not meet the requirements for the assisted guardianship program because she is too young, and that "the waiver program is structured to cover a group of children who are the least likely to be adopted."