IN THE SUPREME COURT OF THE STATE OF DELAWARE

GEORGE FROST                        §
and JANE BURTON,[1]                 §
                                    §     No. 121 and 124, 2024
    Respondents Below,     §     **Consolidated**
    Appellants,            §
                                    §     Court Below: Family Court
    v.                     §     of the State of Delaware
                                    §
DEPARTMENT OF SERVICES              §     File Nos.         23-02-1TK, 23-02-2TK
FOR CHILDREN, YOUTH, AND            §     Petition Nos.   23-01898, 23-02179
THEIR FAMILIES (DSCYF/DFS),         §
                                    §
    Petitioner Below,      §
    Appellee.              §

Submitted:  December 4, 2024
Decided:    February 24, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, and **LEGROW**, Justices.

**O R D E R**

This 24th day of February, 2025, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1)    The appellants ("Mother" and "Father") share two sons: L.F., born February 12, 2019, and T.F, born August 13, 2020.  Father also has two sons from a previous relationship: J.F., born October 12, 2013, and N.F., born October 22, 2015. Mother and Father have jointly appealed a Family Court order ("TPR Order") that

---

[1] The Court previously assigned pseudonyms to the appellants under Supreme Court Rule 7(d).

1

terminated their respective parental rights to those four children ("the Children"). Both Mother and Father have additional children with other partners, but those children are not relevant in these proceedings.

(2) The Family Court held that Mother and Father failed to plan for the Children's physical needs and for their mental and emotional heath and development as described by 13 *Del. C.* § 1103. The court further concluded that the Division of Family Services ("the Division" or "DFS") used reasonable efforts to prevent the children's removal and reunify the family, and that it was in the Children's best interest to terminate Mother and Father's parental rights. Mother and Father appeal each of the court's findings and argue that the court abused its discretion in finding clear and convincing evidence to terminate their parental rights. None of the appellants' arguments support reversal and we therefore AFFIRM the Family Court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

(3) The Division's contact with Mother and Father began several years before the Children were removed from their care in 2022. Father and J.F. and N.F.'s biological mother made numerous allegations of abuse and neglect against one another, and Father was subject to several Protection from Abuse orders during their marriage. The Division also received concerning reports about J.F. and N.F.'s hygiene and the condition of the home. Mother and her two daughters (not subject

2

to this case) moved into Father's home in 2018, shortly after his marriage to J.F. and N.F.'s biological mother ended. Hotline reports and investigation by DFS during this time once again revealed concerns about the Children's hygiene and the condition of the home.

(4)    All four of the Children have extensive support needs. J.F. has a diagnosis of Autism and developmental delays and was considered nonverbal while in Mother and Father's care due to his very limited speech. When he was removed from Mother and Father's care at age eight, J.F. was not yet toilet trained and wore adult diapers. J.F. also requires extensive supports and specialized instruction for his education. Father failed to address concerns raised by J.F.'s teacher during and after the COVID-19 pandemic regarding J.F.'s skill regression associated with his poor attendance and Father's failure to accept school resources.[2]   J.F.'s teacher observed that J.F. was often clothed only in a diaper and appeared unkempt during online schooling sessions.

(5)    N.F. was six years old when he was removed from Mother and Father's care, and he too was not toilet trained. N.F. has diagnoses of ADHD and disruptive

---

[2] In April 2020, during the COVID-19 outbreak, J.F.'s school offered Chromebooks to each family to access virtual instruction. Father declined a Chromebook and instead chose to use his cell phone. J.F.'s teacher testified that the cell phone significantly limited the effectiveness of J.F.'s instruction because it did not permit the full use of interactive programs or allow her to determine whether J.F. was responding correctly. J.F. missed twenty-two days of instruction from March to June 2021, and twenty-four of thirty-six occupational therapy sessions between December 2020 and June 2021.

3

mood dysregulation disorder, exhibits aggression toward others, and engages in self-harm. He also suffers from a chronic eye condition caused by the herpes virus. N.F. alleged that Father mistreated him and required crisis services and hospitalization at the Rockford Center several times during the Family Court proceedings.[3]

(6) L.F. and T.F. also have developmental delays and behavioral issues. L.F. is diagnosed with Autism. The family received Early Head Start services from August 2020 until August 31, 2023, to provide Mother and Father with tools and skills to engage with L.F. and T.F. and develop their fine motor, cognitive, language, and social skills.

(7) The Division received repeated reports regarding the condition of the family's home, which code enforcement ultimately condemned on October 6, 2021. The code enforcement officer testified that:

> . . . the odor was so bad in the home that [she] had to immediately return outside and get a mask just to continue the inspection. There was food, food waste, and trash on the floor and furniture, and [her] shoes stuck to the floor as she walked across it. There were signs of bedbugs, and cockroaches ran throughout the home. Fecal smears were on the walls and dirty diapers were on the floor.

The family resided at the Hope Center while their home was cleaned, and they returned on December 23, 2021, when the condemnation order was lifted.

---

[3] "[N.F.] has told his foster parent, Tiffany Adams, that he 'is safe in foster care, because Ms. Gina [Baker] told my daddy you can't hit me anymore, so now daddy is nice to me.' Father denies mistreating [N.F.]" App. to OCA's Answering Br. at C2.

(8)    On January 21, 2022, Mother gave birth to another child, S.F, who died at about three weeks of age.  The Dover Police Department began investigating the circumstances of S.F.'s death, and DFS received emergency *ex parte* custody of L.F. and T.F on March 1, 2022, after unsuccessfully attempting to implement a safety plan for Mother and Father.[4]  DFS also sought custody of J.F. and N.F. at that time, but ultimately dismissed that petition and placed the two children with their biological mother.

(9)    On April 4, 2022, the Family Court held an Adjudicatory Hearing on the Division's petition for custody of L.F. and T.F.  Mother and Father presented evidence that some of the conditions that led to the home's condemnation were the landlord's responsibility.   The court found that Mother and Father were "not currently able to meet the children's basic needs on a fulltime basis."[5]  The Family Court also found that DFS had used reasonable efforts to maintain the family and prevent Children's unnecessary removal from the home.[6]

---

[4] DFS entered into a series of safety agreements to keep the children in the home. The final safety agreement was developed on or about February 17, 2022, and required that Gwen Barber stay with the family and supervise the care of the children. Barber testified that Father locked her out of the home on March 1, 2022, and the parents were unresponsive to attempts to contact them. DFS attempted to salvage the safety plan by requiring that Father leave the home so that Barber would stay, but Father never left and Barber refused to continue as the safety person.

[5] More specifically, the court found that Mother and Father (1) failed to cooperate with safety planning during the investigation into the death of their infant son; (2) ". . . struggle[d] to maintain the home to basic minimal standard without support and while the children were in their care;" and (3) were unable to meet the basic needs of the children regarding teaching and discipline by ensuring that they attended school. App. to Opening Br. at A24.

[6] DFS began providing services to Mother and Father before S.F.'s death to address concerns about the Children's safety and wellbeing, and DFS developed safety plans after S.F.'s death to attempt

(10) On April 22, 2022, DFS again filed for custody of J.F. and N.F. after their biological mother was unable to care for them and there was evidence of physical abuse in her home. On May 11, 2022, the court held an Adjudicatory Hearing, which was waived by J.F. and N.F.'s biological mother but continued for Father. The same day, the court held a Dispositional Hearing during which DFS presented case plans for Mother and Father. The case plans largely overlapped and included the following elements: Father will maintain employment, and Mother will find a job or receive SSI benefits; Parents will maintain a clean and safe home; Parents will complete a parenting class and show evidence of learning behaviors from the class; Parents will attend the boys' school and medical appointments, as well as weekly visits; Parents will work with a Family Interventionist to improve their parenting skills; and Mother will complete a Comprehensive Cognitive or Mental Health evaluation[7] and follow any resulting recommendations. The court found that the Division had used reasonable efforts since the last hearing to achieve permanency for the Children, but they remained dependent as to their parents.

---

to keep the family together. After the safety plans failed and the Children were removed from the home, DFS used reasonable efforts to reunify the family by facilitating visitation and continuing to offer services.

[7] A psychological evaluation revealed that Mother suffered from PTSD, largely arising from S.F.'s death, and that her cognitive functioning was in the borderline range. The Family Court denied the Division's request that Father also undergo a psychological evaluation after Father opposed the requirement.

(11) On June 1, 2022, the Family Court convened an Adjudicatory Hearing for Father regarding J.F. and N.F. The court found that Father had failed to meet the boys' educational and developmental needs and was "not currently able to consistently provide basic care for the boys."[8] The court also found that the Division made reasonable efforts to prevent J.F. and N.F.'s removal from the home, citing the Division's efforts in referring the family to services and contacting relatives to locate alternative placements.

(12) On August 3, 2022, the Family Court held review hearings for all four children. The court reviewed Mother and Father's progress on their case plans and determined that the Division was using reasonable efforts to reunify the family. The Division obtained services for both the parents and children, purchased items for the home, and expanded in-home visits between the family. The court heard evidence that the medical examiner determined that S.F.'s cause of death was sudden infant death syndrome (SIDS), and the investigation into S.F.'s death was closed. Both parents were working with a family interventionist; Father was employed at Safeway and Mother had applied for Social Security benefits; and the house remained appropriate. Despite finding that Mother and Father had made progress on their plans and that reunification remained the appropriate goal, the court continued custody with DFS.

---

[8] App. to Opening Br. at A31.

(13) The Family Court held a second review hearing for both cases on October 31, 2022, and heard evidence that Father continued to work; there were no concerns about the condition of the home; Mother had begun therapy and had become more interactive with the children; and Mother and Father were committed to regaining custody and were receiving services and regularly visiting the Children. The court found that DFS continued to make reasonable efforts to reunify the family by providing tailored interventions with Mother and Father to address the Children's significant needs. The court continued DFS custody of the Children.

(14) The next review hearing for both cases was on January 31, 2023. The Family Court found that Mother and Father were making progress toward their reunification goal,[9] but that progress was achieved with extensive interventions and supports in place. The parents had the Children in their care for only a few hours each week and still required regular prompting to intervene with them. Because the Children had been in the Division's custody for over a year and Mother and Father were still unable to reunify with the Children, the Family Court granted the Division's motion to change the permanency goal of the cases from reunification to concurrent goals of reunification and termination of parental rights.

---

[9] "Mother and Father are making progress toward reunification with [T.F. and L.F.]: they are financially stable enough to maintain their home and are keeping it clean; Father has begun domestic violence interventions and Mother is about to begin counseling; Mother has begun setting expectations for the children's behavior and Father is becoming more receptive to Mother's input; and most importantly Mother and Father are becoming more engaged and responsive to the children." *Id.* at A55.

(15)  A Caregiver-Child Assessment performed by Dr. Joseph Zingaro was also presented to the Family Court at the January 31 review hearing.  Dr. Zingaro offered several recommendations, including that (1) "Father and Mother must demonstrate that they can maintain regular routines and expectations for the children;"[10] (2) "Mother and Father are more likely to be successful if [L.F. and T.F.] are returned to their care before [N.F. and J.F.];"[11] and (3) "the family's team members, including the children's foster parents, should meet to identify very specific behaviors and interventions likely to be successful with the children; develop measurable benchmarks Mother and Father are expected to achieve; and measure their behavior against a reasonable level of performance,"[12] which Dr. Zingaro suggested might be 80% of the time; and (4) he should reassess the family in about six months.

(16)  The Division held three team meetings in February 2023 to develop a parenting plan with specific parenting skills for Mother and Father to master, as recommended by Dr. Zingaro.  Mother and Father reviewed and signed the plan on February 21, 2023, and a DFS permanency worker, Amanda Niblett-Boggs, met with them monthly thereafter to discuss their progress.  Any concerns that Mother

---

[10] *Id.*
[11] *Id.*
[12] *Id.*

and Father were not meeting expectations were discussed with them promptly by either Ms. Niblett-Boggs or their family interventionist, Tianna Carter.

(17) In May 2023, the Division concluded that Mother and Father had made sufficient progress on their case plans to allow a trial reunification for L.F. and T.F. Mother and Father received support from DFS and the boys' foster mother, Carissa Stevens, in preparation for the two younger children's return to the home.[13] Trial reunification began with an overnight visit on May 9, 2023. Next, DFS arranged a weekend visit. On both occasions, DFS received reports from the children's daycare that L.F. arrived with a full pull-up. Ms. Niblett-Boggs and Ms. Carter addressed this issue with Mother and Father and provided suggestions to prevent reoccurrence. DFS then placed L.F. and T.F. in Mother and Father's full-time care on May 26, 2023, and asked Dr. Zingaro to assess Mother and Father's progress since his initial evaluation.

(18) During the trial reunification, Mother and Father removed the children from Expanding Our Kids' World, where they had been enrolled while in foster care, and placed them at a different childcare center. The director at the new center disenrolled the children after approximately three weeks because they exhibited

---

[13] Stevens shared very specific information with Mother and Father about L.F. and T.F.'s routines and provided the parents with comfort items like stuffies and a sound machine. She shared these routines through texts, video messages, and written documentation as reunification approached so that the parents could continue the routines post-reunification. DFS helped to obtain furniture, bedding, clothing, and toys for the children.

extreme behavioral difficulties.[14] The boys then returned to Expanding Our Kids' World. Ms. Stevens provided transportation to the daycare because Mother and Father did not have drivers' licenses or a vehicle.

(19) Concerns arose during the trial reunification regarding physical neglect and Mother and Father's ability to consistently meet the children's basic needs. T.F. and L.F.'s daycare teachers at Expanding Our Kids' World reported concerns about the children's behavior and hygiene. The boys repeatedly arrived at daycare with full pull-ups that appeared to have been urinated in multiple times. On at least one occasion, there was evidence that the boys had not been wiped after bowel movements. T.F. became aggressive toward his peers and teacher, and both boys were visibly tired and often refused to eat. T.F. and L.F.'s teachers also documented occasions on which the children arrived at school unclean.

(20) Ms. Niblett-Boggs met with Mother and Father in their home on July 3, 2023, to address the concerns that were being reported by the daycare. Ms. Niblett-Boggs informed Mother and Father that DFS would remove the children for physical neglect if the reports continued. Mother and Father disputed the daycare's reports, and Ms. Niblett-Boggs suggested that the parents send her daily pictures to

---

[14] The director of the new center, Dawn Landon, described instances of L.F. screaming, throwing himself around, crawling around, and taking off his clothing. T.F. acclimated well at first, but eventually became aggressive to the point of hitting a teacher. Landon testified that when she reached out to Father for assistance on two occasions, he replied it was the daycare's responsibility to handle the issues. She further testified that she observed Father yell at Mother on multiple occasions and that he was so aggressive and rude toward Mother that she contacted the Division.

show that the boys were clean, but they did not do so. Ms. Niblett-Boggs and Ms. Carter met with Mother and Father again on July 18, 2023, and discussed the ongoing concerns. After that meeting, DFS received another concerning report from the daycare and made the decision to end the trial reunification.[15] On July 21, 2023, L.F. and T.F. were removed from Mother and Father's home.

(21) The physical condition of Mother and Father's home deteriorated again after the trial reunification ended. Ms. Niblett-Boggs visited on August 29, 2023, and noted that there was an overwhelming odor in the home, live and dead cockroaches, and clogged sinks in the kitchen and downstairs bathroom. Ms. Niblett-Boggs also testified that Father minimized or denied N.F.'s behavioral issues, was consistently late to or absent from N.F.'s monthly medication appointments, was resistant to working with T.F.'s daycare to manage his behaviors, and generally did not interact much with J.F. during visits.

(22) Dr. Zingaro completed his updated caregiver assessment in August 2023. He concluded that Mother and Father do better with intensive support and supervision but regress without it. His update reaffirmed that when Mother and Father were presented with negative feedback, they dismissed it as a lie, and Father

---

[15] T.F.'s daycare teacher, Kelsey Shaw, testified about a phone interaction she had with Father on July 19, 2023. During the call, Father accused the daycare of submitting incorrect and untrue reports to DFS and stated that the daycare was going to cause his children to be taken away from him. Shaw testified that Father's tone was very aggressive and demanding, and Landon reported the phone call to Ms. Niblett-Boggs.

was very oppositional to help. He also opined that the Children do better when they are in a different environment. He testified that the Children's response to a positive foster home environment and their regression when returning to Mother and Father's care (an "ABAB" design) gave "a tad more confidence"[16] that the changes in the Children's behavior were attributable to the environment and not the passage of time or other variables. Even without the benefit of an ABAB design, however, Dr. Zingaro did not believe that Mother and Father were successfully meeting the Children's needs based on the information he gathered for his assessment.

(23) A Post-Permanency Review hearing and Termination of Parental Rights ("TPR") hearing was scheduled for September 6, 2023. But after the trial reunification ended in July, Mother and Father filed a series of motions. At the parties' request, the Family Court heard oral argument and ruled on the motions in lieu of proceeding with an evidentiary hearing on the TPR petition. The motions included Father's motion to exclude causation testimony under Delaware Rule of Evidence 702. The Family Court held that the motion was premature and that specific objections to testimony could be raised at trial. This order was not appealed and no such objections were raised during trial.

(24) Mother and Father's TPR trial was conducted over the course of three days. Appellants opposed the termination of their parental rights. On February 26,

---

[16] App. to OCA's Answering Br. at C278–79.

2024, the Family Court issued its decision terminating Mother and Father's parental rights in the Children for failure to plan under 13 *Del. C.* § 1103. The court held that DFS used reasonable efforts to provide reunification services, and that it was in the Children's best interest to terminate Mother and Father's parental rights. Mother and Father filed timely appeals.

## ANALYSIS

(25) "When reviewing the decision of the Family Court to terminate parental rights, this Court conducts a 'review of the facts and law, as well as the inferences and deductions made by the trial court.'"[17] Legal conclusions are reviewed *de novo*.[18] To the extent the decision relies on factual findings, we review those findings to ensure that they are supported by the record and are not "clearly wrong."[19] This Court will not disturb inferences and deductions that are supported by the record and are the product of an orderly and logical deductive process.[20] If the Family Court has correctly applied the law, this Court's standard of review is abuse of discretion.[21]

---

[17] *Brock v. Dep't of Servs. for Child., Youth, & Their Families*, 272 A.3d 781, 787 (Del. 2022) (quoting *Powell v. Dep't. of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 730 (Del. 2008)).

[18] *George v. Dep't of Servs. for Child., Youth & Their Families*, 150 A.3d 768, 2016 WL 6302525, at *4 (Del. Oct. 27, 2016) (TABLE).

[19] *Bower v. Dep't of Servs. for Child., Youth & Their Families*, 142 A.3d 505, 2016 WL 3382353, at *4 (Del. June 9, 2016) (TABLE).

[20] *Powell*, 963 A.2d at 731.

[21] *Jones v. Lang*, 591 A.2d 185, 186 (Del. 1991).

(26) Mother and Father submit three arguments on appeal: (i) the Family Court erred by finding that Mother and Father failed to plan for the Children under 13 *Del. C.* § 1103; (ii) the Family Court erred by holding that DFS used reasonable efforts to provide reunification services and prevent removal of the Children; and (iii) the Family Court erred by finding that was in the Children's best interest to terminate Mother and Father's parental rights.[22]

**A. The Family Court did not abuse its discretion by finding clear and convincing evidence that Mother and Father failed to adequately plan for the Children under 13 *Del. C.* § 1103(a)(5).**

(27) A petition to terminate parental rights requires a court to undertake a two-step analysis.[23] Under the first step, the Family Court considers whether the Division has established by clear and convincing evidence a statutory basis for termination under Section 1103.[24] In this case, DFS sought to prove that Mother and Father failed to plan for the Children's physical needs and mental and emotional health and development under Section 1103(a)(5).[25] When termination is sought based upon failure to plan, the Family Court also must conclude that at least one of the conditions set forth in Section 1103(a)(5)(a) is met.[26] Appellants do not contest

---

[22] *Id.* at 37.

[23] *Powell*, 963 A.2d at 731 (citing 13 *Del. C.* § 1103(a); *Div. of Fam. Serv. v. Hutton*, 765 A.2d 1267, 1271 (Del. 2001)).

[24] *Id.* (citing 13 *Del. C.* § 1103(a)(1)–(8); *Hutton*, 765 A.2d at 1271). The second step is a best-interest analysis, which we will address in connection with the third claim on appeal.

[25] *See* Appellee DFS' Answering Br. at 19; Appellants' Opening Br. Ex. A ("TPR Order") at 2.

[26] *Powell*, 963 A.2d at 731 (citing 13 *Del. C.* § 1103(a)(5)(a); *Hutton*, 765 A.2d at 1271).

that an enumerated statutory condition was met, as the Children had been in the Division's care for over one year.[27]

(28)  Mother and Father argue that the Family Court erred by finding clear and convincing evidence that they failed to adequately plan for the Children's needs because (i) Appellants substantially complied with their case plans;[28] and (ii) the court considered the "unreliable" testimony of Dr. Zingaro.[29]

(29)  Regarding Mother and Father's first argument, the relevant inquiry is not whether Appellants made some progress toward completing their case plans, but rather,

> '[w]hether the conditions that led to the child's placement . . . continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable [parents] to discharge parental responsibilities so that the child can be returned to [parents] in the near future.'[30]

Moreover, "the crucial factor should be the child's welfare, both material and psychological."[31]  If a parent has failed to fulfill *any* requirement of their DFS case

---

[27] Appellants' Opening Br. at 24 n.8.

[28] *Id.* at 24–27.

[29] *Id.* at 27–29.

[30] *Brown v. Div. of Fam. Services*, 14 A.3d 507, 511 (Del. 2011) (quoting 13 *Del. C.* § 1103(a)(5)(a); *Powell v. Div. of Family Servs.*, 2011 WL 252950, at *2 (Del. Jan. 27, 2011)).

[31] *Briggs v. Dep't of Servs. for Children*, 308 A.3d 168, 2023 WL 7127571 at *2 (Del. Oct. 30, 2023) (TABLE) (quoting *In re Three Minor Child.*, 406 A.2d 14, 17 (Del. 1979) (citations omitted)).

plan necessary to provide adequate care for their child, Section 1103(a)(5) will be satisfied even where a parent has otherwise completed the case plan.[32]

(30) The Family Court found clear and convincing evidence that Mother and Father are unable to consistently meet the Children's basic physical needs and were residing in the same conditions that led to the Children's placement with DFS after their home was condemned in 2021. Mother and Father's case plans stated that they would maintain a clean and safe home, but concerns persisted regarding the parents' ability to do so.[33] The home's condition rapidly deteriorated in August 2023 after the trial reunification period ended and the children no longer were living there. As the Family Court noted, the evidence demonstrates that Mother and Father "maintain minimal household standards only when under supervision, receiving services, or, more recently, with the hearing on these matters looming."[34] The court's conclusion

---

[32] *Id.* (citing *Griffin v. Dep't of Servs. for Child., Youth & Their Fams.*, 296 A.3d 882, 2023 WL 3046056, at \*2 (Del. Apr. 21, 2023) (TABLE) (holding that termination of parental rights was supported by the record where the parent failed only to obtain stable housing as required by case plan)); *Arthur-Lawrence v. Div. of Fam. Servs.*, 884 A.2d 511, 2005 WL 2397523, at \*3–6 (Del. Sept. 27, 2005) (TABLE) (holding that termination of parental rights was supported by the record where the parent failed to complete two parts of a seven-part case plan); *George*, 2016 WL 6302525, at \*4–5 (holding that termination of parental rights was supported by the record where the parent completed twenty-five percent of their case plan); *Whitmore v. Robinson*, 223 A.3d 417, 425–26 (Del. 2019) (Seitz, C.J., concurring) (noting that the Family Court often terminates parental rights solely on a failure to satisfy their DFS-provided case plan)) (emphasis added).

[33] Mother and Father assert that, during the period that the Division had custody of the Children, there were no concerns about the condition of the home until August 2023. Appellants' Opening Br. at 25. Although there were no major issues like those found during the unannounced home inspection in August, Ms. Niblett-Boggs and Ms. Carter addressed cleanliness issues in the home on multiple occasions, including for sticky floors and food around the home. App. to DFS' Answering Br. at B152.1, B155–156.

[34] TPR Order at 60.

17

that Mother and Father failed to maintain a clean and safe home is supported by the record and is the product of an orderly and logical deductive process, which itself is sufficient to constitute a failure to plan under 13 *Del. C.* § 1103(a)(5).

(31) Next, Mother and Father argue that the court erred when it "relied" on the testimony of Dr. Zingaro in finding that they failed to plan, as well as when considering his testimony regarding the Children's behaviors.[35] As a preliminary matter, Father failed to raise this evidentiary objection during trial. Father filed a pre-trial motion under Delaware Rule of Evidence 702 to exclude causation testimony from Dr. Zingaro and several DFS workers.[36] The Family Court held that the motion was premature and that specific objections to such testimony could be raised at trial.[37] Father did not object at trial and the Family Court therefore did not address the argument at trial or in the TPR Order. Consequently, this argument was not preserved for appeal.[38]

(32) We may excuse a waiver under Supreme Court Rule 8 if the trial court committed plain error and the interests of justice require review.[39] We find no basis

---

[35] Appellants' Opening Br. at 28.
[36] App. to Opening Br. at A64.
[37] *Id.*
[38] Del. Sup. Ct. R. 8; *see Pollard v. State*, 284 A.3d 41, 42 (Del. 2022) (discussing how Rule 8 precludes review of issues not raised in the trial court unless the interests of justice require it); *Damiani-Melendez v. State*, 55 A.3d 357, 359 (Del. 2012) ("A '[f]ailure to make an objection at trial constitutes a waiver of [a] defendant's right to raise that issue on appeal, unless the error is plain.'") (citing *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986) (citations omitted); Del. Sup. Ct. R. 8).
[39] *See Pollard*, 284 A.3d at 42; *Damiani-Melendez*, 55 A.3d at 359.

to reverse the Family Court under that standard. Mother and Father criticize Dr. Zingaro's "ABAB analysis," but the Family Court made no reference to this analysis when it held that Mother and Father failed to properly plan for the Children. In referencing Dr. Zingaro's assessments, the Court simply stated that "the evidence fully supports [Dr. Zingaro's] conclusion that the family does well with intensive services, but that when these are withdrawn, consistently regress 'to their own mean'—a mean not adequate to meet the Children's needs (or the needs of any one of them)."[40] Testimony to which the parents did not object and on which the Family Court did not rely does not serve to undermine the court's factual findings or its legal conclusions.

(33) The Family Court correctly applied the law to its factual findings in concluding that Mother and Father failed to plan under 13 *Del. C.* § 1103(a)(5). [41] Accordingly, the court did not abuse its discretion.

**B. The Family Court did not abuse its discretion by finding clear and convincing evidence that DFS used reasonable efforts to prevent removal of the Children and provide reunification services.**

(34) When termination is sought on the ground of failure to plan under Section 1103(a)(5), the Family Court must find that DFS made *bona fide*, reasonable

---

[40] TPR Order at 64.
[41] *See Powell*, 963 A.2d at 731; *Interest of Stevens*, 652 A.2d 18, 23 (Del. 1995).

efforts towards reunification.[42]  This requirement is based on federal and state law.[43]

Mother and Father argue that DFS failed to provide them with percentage levels of compliance to their case plans, and "abruptly, without notice to the parents" ended trial reunification, constituting a failure to provide reasonable efforts to prevent removal and facilitate reunification.[44]  We disagree.

(35)   The Family Court repeatedly found during dependency proceedings that DFS was using reasonable efforts to develop and implement Mother and Father's case plans, which targeted their well-known needs and were reasonably designed to return the Children to their care.[45]  The Family Court explained in the TPR Order that:

> The Division promptly arranged for family intervention services, which included helping Mother and Father with budgeting, applications for various services, with their visits with the children, and with pragmatic parenting tips and suggestions. It timely referred Mother for a psychological evaluation and then to a mental health provider. It provided Father a program designed to reduce the risk of domestic violence and referred him and Mother to a parenting course. In the meantime, DFS provided Mother and Father regular and meaningful visits with all four Children, designed in a way to permit them separate time with each set of siblings and to permit the brothers to see each other as well. The Division held three team meetings in February 2023 alone to develop a Parenting Plan for Mother and Father as recommended by Dr. Zingaro as part of his Caregivers Assessment. It then carefully planned a trial

---

[42] *In re Hanks*, 553 A.2d 1171, 1179 (Del. 1989).

[43] *Powell*, 963 A.2d at 738 ("Federal law provides that 'reasonable efforts shall be made to preserve and reunify families . . . to make it possible for a child to safely return to the child's home.' Delaware law requires DFS to provide reunification services to families and to prepare written case plans and review those plans semi-annually.") (quoting 42 U.S.C. § 671(a)(15)(B)(ii); 29 *Del. C.* §§ 9003(3)-(5)).

[44] Appellants' Opening Br. at 31–32.

[45] TPR Order at 66.

reunification for [L.F. and T.F] and provided significant services to help Mother and Father Succeed during the reunification.[46]

(36) As to Mother and Father's argument that DFS failed to provide them with updates on their percentage of compliance in accordance with the 80% threshold suggested by Dr. Zingaro, [47] this fact does not indicate that DFS failed to fulfill its duty. Dr. Zingaro recommended that DFS "develop measurable benchmarks Mother and Father are expected to achieve; and measure their benchmarks against a reasonable level of performance," proving examples such as: "'Mother and Father shall attend 80% of the children's medical appointments and school meetings,' or 'Mother and Father shall read to each child 15 minutes each day, 80% of the time.'"[48]

(37) As recommended by Dr. Zingaro, the Division held three team meetings in February 2023 to develop a parenting plan for Mother and Father that identified discrete parenting skills and measurable goals, *e.g.*, responding to the Children's toileting cues and managing food portions.[49] Although the Division did not update Mother and Father with their compliance percentages, Ms. Niblett-Boggs testified that she met with Appellants monthly to discuss their progress toward these

---

[46] *Id.*
[47] Appellants' Opening Br. at 31.
[48] App. to Opening Br. at A54.
[49] TPR Order at 46–47.

21

goals.[50]  Either Ms. Niblett-Boggs or Ms. Carter promptly voiced concerns that Mother and Father were not meeting expectations.[51]  Although Mother and Father contend that "DFS deprived the parents" of the opportunity to "stay apprised of their progress and know what DFS expected from them,"[52] the record demonstrates otherwise.  The Division's failure to calculate mathematical rates of compliance does not constitute a failure to make reasonable efforts to reunify the family, especially given the Division's other substantial efforts.

(38)  Moreover, the record contradicts Mother and Father's argument that DFS ended trial reunification without any discussion with them and "without any justifiable safety concerns."[53]  To the contrary, the parents had notice of the Division's concerns during trial reunification and knew that the boys would be removed from the home if the concerns continued. Nevertheless, the daycare continued to report concerns about the children's hygiene and care.  The Family Court expressly concluded that "the evidence is clear, and the Court is convinced, that DFS used reasonable efforts both to avoid the Children's removal from their home and to reunify Mother and Father with the Children."[54]  The Family Court's

---

[50] App. to OCA's Answering Br. at C243–44.
[51] *Id.* at C259–60.
[52] Appellants Opening Br. at 34.
[53] *Id.*
[54] TPR Order at 67.

conclusion is supported by the record and is the product of a logical deductive process.

## C. The Family Court did not abuse its discretion by finding clear and convincing evidence that terminating Appellants' parental rights was is in the Children's best interest.

(39)    Under the best-interest standard, which is the second step in the termination-of-parental-rights analysis, "there must be 'clear and convincing' evidence that termination of parental rights is essential to the child's welfare."[55] Section 722(a) governs the Family Court's best-interest determination and enumerates eight factors that the court must consider in making its decision.[56] The factors, however, should not be applied mechanically. The court should consider all

---

[55] *Powell*, 963 A.2d at 733 (citing *Hutton*, 765 A.2d at 1272 (citations omitted)).
[56] The best-interest factors enumerated in Section 722(a) are:
(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian or custodians and residential arrangements;
(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
(4) The child's adjustment to his or her home, school and community;
(5) The mental and physical health of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under [13 *Del. C.* § 701];
(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and
(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense. 13 *Del. C*. § 722(a)

relevant factors, give weight to different factors as warranted under the circumstances, and balance the facts against one another.[57]

(40) Mother and Father argue that the Family Court failed to give weight to several "undisputed facts" when concluding that termination of their parental rights was in the Children's best interest.[58] But the record reflects that the Family Court expressly addressed all the best-interest factors and recounted the evidence that it deemed relevant to each. The Family Court weighed testimony and made factual findings that guided its decision. The court considered the facts relied on by Mother and Father against their failure to consistently meet any one of the Children's most basic needs.[59] Ultimately, the court determined that factors two, three, four, five, and six were dispositive and outweighed considerations under factors one, seven, and eight.[60]

(41) Although Mother and Father expressed their desire to have the Children reside with them[61] (factor one), the interests of the child must prevail where they conflict with those of the parents.[62] The parents contend that the Children who are able expressed a preference to live with their parents,[63] but the court noted that the

---

[57] *Brock*, 272 A.3d at 790; *Bower,* 2016 WL 3382353, at *4.
[58] Appellants' Opening Br. at 37.
[59] TPR Order at 67–69.
[60] *Id.* at 74–77.
[61] Appellants' Opening Br. at 37.
[62] *Powell*, 963 A.2d at 733 (citing 13 *Del. C.* § 1113; *In re Burns*, 519 A.2d 638, 644 (Del. 1986)).
[63] Appellants' Opening Br. at 37.

Children were not interviewed as part of the dependency proceedings, and the Children's attorney and their CASA supported the termination of Mother and Father's parental rights (factor two).[64]

(42)  As to the parents' assertion that the Children interact well among themselves and as a family,[65] the court explained that although T.F. and L.F. are bonded to one another, they likely do not have the same attachment to their siblings, and N.F.'s aggression posed a risk to the younger children (factor three).[66]  Mother and Father contend that termination is not in the Children's best interest, pointing out that N.F. continued to engage in aggressive behavior outside the home and no known persons were interested in adopting the Children.[67]  But immediate adoption is not always possible, and the court noted that each of the Children had made "significant progress in their development" while in foster care (factor four).[68]

---

[64] TPR Order at 68–69.

[65] Appellants' Opening Br. at 37.

[66] TPR Order at 69–70. The Family Court explained that the appellants' home was crowded— there were seven children living there at the time the Children were removed. *Id.* L.F. and T.F. were toddlers when they were removed from Appellants' custody. *Id.* at 70. N.F. and J.F. are in different foster homes and only see one another, as well as L.F. and T.F., for a few hours each week. *Id.* The Children do, however, have well-developed relationships with Mother and Father. *Id.* at 69.

[67] Appellants' Opening Br. at 37.

[68] TPR Order at 76. The Family Court explained that the Children are receiving the respective IEP, speech, behavioral, and occupational therapy that they require and are making progress on their individual goals. *Id.* at 70–71.  For example, J.F. is no longer considered nonverbal and is toileting successfully, and although N.F.'s behaviors remain challenging, the frequency of his outbursts has decreased, and his academic performance has begun to improve. *Id.* at 70–73.

(43)   Although Mother and Father contend that the Family Court failed to give proper weight to the progress that they made on their respective case plans[69] (factor six), the court specifically stated:

> To her credit, Mother continues her mental health treatment and completed a parenting program. To his credit, Father completed both a parenting program for domestic violence interrelations; his interactions with Mother have improved (*best interest factor 7*). Neither parent has any significant criminality that risks the Children's welfare (*best interest factor 8*). *However, these considerations are outweighed by other factors.*[70]

Namely, as to factor six, the Family Court found that the parents had not consistently met their obligations to provide for the Children's basic care and educational needs.[71] Mother and Father attended some of the Children's health appointments, but Father was often late and did not always engage appropriately with the provider.[72]   The court also noted that, "even after repeated interventions and with extensive help, Mother and Father were not able to provide the type of specialized care the younger children [needed] during their trial reunification."[73]

(44)   The Children's special needs compounded the demands on Mother and Father, who themselves have cognitive, developmental, mental, or behavioral health needs (factor five).   The court explained that it was "satisfied that these needs

---

[69] Appellants' Opening Br. at 38.
[70] TPR Order at 76 (emphasis added).
[71] *Id.*
[72] *Id.* at 73.
[73] *Id.* at 78.

necessitate substantial, permanent supports for Mother and Father, and make it nearly certain that Mother and Father will not, together or individually, be able to consistently meet their parenting responsibilities (*best interest factors 5 and 6*)."[74]

(45) The Family Court thoroughly discussed and made written factual findings as to all the best-interest factors enumerated in Section 722(a) and determined through an orderly and logical deductive process that the termination of Mother and Father's parental rights was in the Children's best interest.[75] The parents have not shown that the Family Court abused its discretion in performing the best-interest analysis.

For the foregoing reasons, we conclude that there is no merit to Mother and Father's appeal. NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice

---

[74] *Id.* at 75.
[75] TPR Order at 67–71.